Argued and submitted October 19, 2018, affirmed May 28, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

H. D. E.,
aka H. B., aka H. D. B.,
aka H. E., aka H. S.,
*Defendant-Appellant.*

Umatilla County Circuit Court
16CR46140; A164491

467 P3d 771

Defendant appeals a judgment convicting her of four counts of initiating a false report, arising from defendant's reports that an individual, Garcia, had violated a Stalking Protection Order issued to protect defendant. On appeal, defendant assigns error to the trial court's admission of four exhibits depicting "screenshots" from Garcia's smartphone that purportedly displayed global positioning system (GPS) data generated by the smartphone's "Google Maps" application. Those exhibits were offered as evidence that Garcia had not been where defendant had reported her to be. Defendant argues the state was required to authenticate the evidence under OEC 901(2)(i) because it resulted from a technical process or system. The state responds that Garcia's testimony provided the necessary foundation. *Held*: The trial court did not err. OEC 901 does not require particular methods of authentication. Garcia's testimony provided *prima facie* evidence that the screenshots were what they purported to be.

Affirmed.

Daniel J. Hill, Judge.

Mark Kimbrell, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

_____

* DeVore, J., *vice* Hadlock, J. pro tempore.

DeHOOG, P. J.

Affirmed.

**DeHOOG, P. J.**

Defendant appeals a judgment convicting her of four counts of initiating a false report, ORS 162.375,[1] all arising from 9-1-1 calls in which defendant reported that an individual, Garcia, had violated a Stalking Protection Order (SPO) issued to protect defendant. The primary factual dispute at trial was whether, at the time of the alleged SPO violations, Garcia could have been in Hermiston, Oregon, as defendant had reported, or was, instead, in the Portland/Vancouver area, as Garcia testified. On appeal, defendant assigns error to the trial court's admission, over her objection, of four exhibits depicting "screenshots"[2] taken from Garcia's smartphone. Those screenshots purportedly displayed global positioning system (GPS) data generated by the smartphone's "Google Maps" application and, in turn, suggested that the phone's owner, Garcia, had not been in Hermiston at the reported times. Defendant contends that the challenged exhibits lacked an adequate foundation for admission because the state failed to authenticate them under OEC 901(2)(i), relating to "[e]vidence describing a process or system used to produce a result." The state responds that Garcia's testimony provided the necessary foundation. Reviewing the trial court's evidentiary rulings for legal sufficiency, we agree that the state satisfied the requirements of OEC 901. Accordingly, we affirm.

On appeal of a trial court's evidentiary rulings, "[w]e describe the facts relevant to the challenged rulings in a manner consistent with the trial court's express findings and those implicit in its rulings," provided that there is evidence in the record to support them. *State v. Evensen*, 298 Or App 294, 296, 447 P3d 23, *rev den*, 366 Or 64 (2019).

---

[1] ORS 162.375 has been amended since the events of this case took place; however, because those amendments do not affect our analysis, we refer to the current version of the statute in this opinion. The relevant portion of ORS 162.375 provides:

"(1) A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

[2] No witness at trial specifically explained what a "screenshot" was, but it is evident from the record that, as used in this case, the term refers to a saved image depicting what Garcia's smartphone displayed at a given time.

Further, because defendant was convicted, "we state the background facts in the light most favorable to the state." *Id.* at 297 (internal quotation marks omitted).

In March 2016, for reasons that are not material on appeal, defendant obtained a temporary SPO prohibiting Garcia from contacting her. The SPO remained in effect pending a hearing on the merits scheduled for May 31, at which time the order was dismissed. On four separate occasions over that timeframe, defendant called 9-1-1 to report that Garcia had violated—or was actively violating—the SPO by contacting defendant at or near her home in Hermiston. Specifically, on April 10, defendant called to report that Garcia was trying to break into her shop, had driven by her house several times, and had shot a BB gun towards the house. Defendant was adamant that it was Garcia she had seen, because Garcia had looked her "dead in the face." On April 21, defendant again called to report Garcia driving by her house, this time slowing down to "flip her off." Similarly, On April 24, defendant reported that Garcia had violated the SPO three times that day by driving by her house in various cars while waving at defendant, "flipping her off," and honking. Finally, on May 1, defendant called to report that Garcia had parked near defendant's house and had taken pictures of her as she got out of her car.

At defendant's trial, Garcia testified to having been in the area of Portland and Vancouver, Washington, on the dates that defendant had reported her being in Hermiston. To support Garcia's testimony, the state presented four exhibits, each depicting a series of screenshots taken from Garcia's smartphone on one of the dates in question, and each purporting to establish her movements on those days. According to Garcia, the screenshots displayed GPS data produced by the Google Maps application on her phone, which corresponded to "exactly where [she] was" at the indicated times. Garcia further explained that, on advice from counsel, she had kept the Google Maps application on her phone open and actively running at all times.

Each series of screenshots that the state introduced included a map purporting to depict the smartphone's travel route on a given day, as well as a location-by-location

breakdown of the phone's movements. Miscellaneous photographs taken along each route were embedded in the lists of locations visited. The state offered each series of screenshots in chronological order, and, over defendant's objections on foundational grounds, the trial court admitted each exhibit.

The state's introduction of the April 10 series of screenshots exemplified its efforts to lay an appropriate foundation:

"[STATE:]   And what is this *** document here that I've just handed you?

"[GARCIA:]   It's my GPS on my tracking device on my phone.

"[STATE:]   Okay. And so this *** map here *** on the front of this document, what is this? ***

"[GARCIA:]   It *** tells you exactly where I was *** it tells you where I was at, my apartment and I went to the store and we were driving around. As you can see, we went to Battleground[, Washington].

"* * * * *

"[STATE:]   And at the very top, it says 'screenshot.'

"[GARCIA:]   Mm-hmm.

"[STATE:]   Are these screenshots from your phone?

"[GARCIA:]   Yes, they are.

"[STATE:]   And was this the phone that you have here in the courtroom today?

"[GARCIA:]   Yes, it is.

"[STATE:]   And was this the phone that you had on April 10th, 2016?

"[GARCIA:]   Yes.

"[STATE:]   Okay. And so all of these pages are these screenshots from your phone?

"[GARCIA:]   Yes."

Defendant objected, arguing that, for two primary reasons, the exhibit depicting screenshots from Garcia's smartphone lacked an adequate foundation. First, defendant

argued, the exhibit included "a piece of paper with a map with lines drawn on it *** [but] no evidence that the piece of paper was connected to Ms. Garcia's phone." Second, even if the state "could somehow connect the phone with that map and prove that that phone was actually in Battleground, [it] doesn't mean that Ms. Garcia was in Battleground." Defendant posited that Garcia could have left her smart-phone with her mother while Garcia was in Hermiston, as defendant had reported to 9-1-1.

The state responded that, although defendant's arguments regarding the creation of the exhibits might affect the weight that the finder of fact gave the evidence, they did not affect its admissibility. The state further argued that Garcia's testimony established the required connection between the screenshots and her smartphone. The trial court overruled defendant's objection and admitted the evidence, expressly ruling that the state had met its foundational requirements.

Similarly, when the state introduced its exhibit depicting screenshots from April 21, defendant objected that the evidence "doesn't purport to show what the state says it shows." Specifically, defendant argued that "[t]he state isn't introducing this to show [the court] pictures of maps of Vancouver, Washington *** [but] to prove that Ms. Garcia wasn't in Hermiston, Oregon *** [and the evidence] does not prove that." The trial court again overruled defendant's objection, agreeing with the state that those arguments went to the weight of the evidence rather than its admissibility.

Defendant took a somewhat different tack as to the April 24 screenshots, first questioning Garcia in aid of objection. When defendant asked her how the state had obtained screenshots from her phone, Garcia described the process as something "anyone [could] do." She explained that, while she was with the prosecutor in his office, she had captured each screenshot from her phone and emailed it to him; the prosecutor had then used his office printer to make paper copies. When asked about the specific application she had used, Garcia said that she used the GPS feature on her phone's Google Maps application, which enabled her to track such things as how far she walked in a day, noting that "it

actually tracks everything, everywhere you go." At the end of defendant's questions in aid of objection, she again objected for lack of foundation, but once again the court overruled her objection, citing the same grounds as before.[3]

The screenshot exhibits were not the only evidence of Garcia's whereabouts on the dates in question. Garcia also testified that she had been in the Portland/Vancouver area on the dates reflected in the disputed exhibits. For example, Garcia testified that she knew that she had been in or around Battleground, Washington, on April 10, not just because of the map on her phone and the screenshot evidence suggesting that fact, but also simply because she remembered having been there at that time. Similarly, Garcia testified that she remembered dropping her daughter off at school in Vancouver on April 21, after which she had gone to work in Portland. Garcia likewise testified to remembering certain errands that she had run in the Vancouver area on April 24, and, although she did not testify to independently remembering her specific whereabouts on May 1, she did testify that she was in Vancouver rather than Hermiston on that day.

Defendant waived her right to a jury trial and tried her case to the court, which found her guilty on all counts. This appeal followed.

On appeal, defendant reprises and refines the argument that she made to the trial court. Emphasizing the authentication requirements of OEC 901, defendant contends that, as a predicate to admitting the screenshot evidence—that is, as its foundation—the state was required to produce "evidence sufficient to support a finding that the matter in question [was] what its proponent claim[ed]." OEC 901(1) (stating that the authentication requirement is satisfied by evidence supporting that finding). In defendant's view, the state failed to properly authenticate the screenshot evidence because "the foundation [that the state] laid did not establish that the evidence was what the state purported it to be," namely, "evidence memorializ[ing] the actual location of

---

[3] Defendant objected once more to the May 1 screenshots, but, as with her previous objections, the trial court overruled that objection on the "same basis as previous exhibits."

Garcia's phone" at the times that defendant reported Garcia to be in Hermiston. More specifically, defendant argues that the state did not produce sufficient evidence to support the finding that the GPS data that the screenshots purportedly depicted was, in fact, GPS data and probative of the phone's location at the indicated times.[4]

As for how the state might have established that foundation, defendant points to OEC 901(2)(i), which, she argues, is the "most fitting" means of authentication. OEC 901(2)(i) permits a party to satisfy the requirements of OEC 901(1) by producing "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Citing *United States v. Lizarraga-Tirado*, 789 F3d 1107 (9th Cir 2015) (considering similar evidence under FRE 901), defendant reasons that, because the way in which the Google Maps application generates GPS data is "a process or system used to produce a result"—*i.e.*, information as to the phone's whereabouts— the state was required to present evidence describing that process or system and showing that it produced an accurate result. *See* OEC 901(2)(i) (permitting authentication with evidence that both describes a process or system and shows it to produce accurate results). And, defendant argues, Garcia lacked the expertise to provide that testimony as to the GPS evidence at issue here. As a result, defendant argues, the trial court erred in overruling her objections to that evidence.

The state responds that Garcia's testimony provided a sufficient foundation to satisfy the authentication requirements of OEC 901, which, the state argues, presents a "low bar." In the state's view, because Garcia's testimony regarding her own whereabouts on the dates in question mirrored the GPS data depicted in the screenshots, that testimony provided the finder of fact a basis from which

---

[4] At trial, defendant took that argument one step further, contending that the state's foundational evidence must be sufficient to allow the trier of fact to find that the screenshot evidence accurately portrays the fact it is ultimately offered to prove: Garcia's location on the dates in question. However, to the extent that defendant contends on appeal that a foundation sufficient to find that the screenshot evidence accurately reflected the *phone's* location on those dates could not support a further inference regarding *Garcia's* location, we agree with the state that that argument goes to the weight of the evidence, not its admissibility.

to conclude that the screenshot information was accurate. The state acknowledges that, in some instances, such as when a party relies on GPS evidence to prove locations or travel routes that are otherwise unknown, OEC 901 may require additional evidence that the GPS data is accurate. Even then, the state contends, defendant would be wrong to suggest that OEC 901(2) requires specific forms of evidence to be authenticated in specific ways. Rather, as OEC 901(2) explicitly states, the listed "examples of authentication * * * conforming with the requirements of subsection (1)" are provided "[b]y way of illustration only, and not by way of limitation."

We have not previously had occasion to consider the foundational requirements for GPS evidence. However, as we recently observed in *State v. Sassarini*, 300 Or App 106, 119, 123-27, 452 P3d 457 (2019), the increased prevalence of digital evidence in modern trials raises "challenging evidentiary questions" under OEC 901, requiring both close attention to the requirements of that rule and flexibility in how we approach it. That being said, under the narrow circumstances presented by this case, and, for the reasons that follow, we readily conclude that state sufficiently authenticated the GPS evidence at issue here and that the trial court, therefore, did not err.

We begin with the basics. First, in determining whether the state sufficiently authenticated its evidence under OEC 901, we review the foundational evidence for legal sufficiency. *Sassarini*, 300 Or App at 127. Second, under OEC 901, legal sufficiency "requires only 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* at 130 (quoting OEC 901(1)). That threshold "is not high," and, for the state's evidentiary foundation to be deemed sufficient, we need not conclude that "the evidence is necessarily what the proponent claims." *Sassarini*, 300 Or App at 130 (internal quotation marks omitted). Rather, as we explained in *Sassarini*, OEC 901(1) only requires the proponent of evidence to make a "*prima facie* showing" of authenticity before the question whether the evidence is what it purports to be can go to the ultimate finder of fact. *Id.* at 127. Finally, although OEC 901(2) provides examples of foundations that will satisfy the

requirements of OEC 901(1), those examples are intended to illustrate, not limit, the ways in which evidence may be authenticated. OEC 901(2); *see also Sassarini*, 300 Or App at 126 (acknowledging that the listed examples "are not exclusive allowable methods but are meant to guide and suggest" (internal quotation marks omitted)).

With those standards in mind, we turn to the parties' arguments in this case. As noted, defendant argues that the state was required to authenticate the screenshot evidence utilizing the method described at ORS 901(2)(i), which provides:

"(2)   By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of subsection (1) of this section:

"* * * * *

"(i)   Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

To support her contention that ORS 901(2)(i) provided the "most fitting" means to authenticate the GPS evidence in this case, defendant cites the Ninth Circuit's decision in *Lizarraga-Tirado*. In *Lizarraga-Tirado*, the defendant had been charged with illegally reentering the United States following removal, 8 USC section 1326. 789 F3d at 1108. At issue at trial was whether, in fact, the defendant had been north of the United States-Mexico border at the time of his arrest. *Id*. To corroborate the testimony of the Border Patrol agents, who testified to being very familiar with the area and certain that the arrest had been north of the border, the government introduced a "Google Earth" satellite image. *Id*. The image purported to depict the approximate location of the arrest by means of a digital "tack," which was labeled with the GPS coordinates that one of the agents had recorded with a handheld GPS device. *Id*.

On appeal, the issue before the court was whether, by asserting the location of the defendant's arrest, the Google Earth image—and particularly its labeled "tack"—constituted inadmissible hearsay. *Id*. at 1109. The court

ultimately concluded that the image was not hearsay, because the tack had not been added manually; rather, the Google Earth program had automatically generated the tack based on the GPS coordinates that one of the agents had recorded.[5] *Id*. at 1109-10.

Notably, the defendant in *Lizarraga-Tirado* did not challenge the foundation for any aspect of the GPS evidence—neither the agent's recording of the GPS coordinates nor the generation of the corresponding satellite image by Google Earth. But, relevant to this case, the court observed that, notwithstanding its ruling that the satellite image was not hearsay, "machine statements [can] present evidentiary concerns." *Id*. at 1110. Specifically, "[a] machine might malfunction, produce inconsistent results or have been tampered with." *Id*. Those concerns, however, "are addressed by the rules of authentication[.]" *Id*. (citing FRE 901(a) (requiring showing by proponent of evidence that it "is what the proponent claims it is")); *see also id.* (proponent of "machine statements" must show that the machine is "reliable and correctly calibrated" and that its input data— there, the GPS coordinates—is accurate).

As defendant in this case emphasizes, the Ninth Circuit went on to suggest that, for the Google Earth evidence at issue there, the proper means of authentication would be that provided by FRE 901(b)(9) (permitting authentication of a process or system that produces a result by describing process or system and "showing that it produces an accurate result"). *Id*. (citing *United States v. Espinal-Almeida*, 699 F3d 588, 610-12 (1st Cir 2012) (evaluating foundation for annotated Google Earth-generated maps and underlying GPS data in light of FRE 901(b)(9)'s "illustrative authentication technique")). Further, the court said, had the defendant challenged the Google Earth-generated images on authentication grounds, the government would have been required to establish the reliability and accuracy of Google Earth with, for example, the testimony of "a Google Earth programmer

---

[5] Defendant in this case did not raise a hearsay objection to the state's screenshot exhibits at trial and makes no such argument on appeal. We express no opinion whether the exhibits were, in fact, hearsay or whether our analysis of that issue would track that of the Ninth Circuit in *Lizarraga-Tirado*.

or a witness who frequently works with and relies on the program." *Lizarraga-Tirado*, 789 F3d at 1110 (citing Charles A. Wright & Victor J. Gold, 31 *Federal Practice and Procedure* § 7114, 141-42 (2000)).[6]

The difficulty that we have with defendant's argument that the state was required to satisfy OEC 901(2)(i) is threefold. First, she has not shown us why we should view *Lizarraga-Tirado* as controlling or even persuasive. As the Supreme Court observed in *State v. O'Key,* 321 Or 285, 292 n 7, 899 P2d 663 (1995), although the Oregon Evidence Code is modeled on the Federal Rules of Evidence, even opinions of the United States Supreme Court are cited only to the extent they may be persuasive when we interpret provisions of the OEC. And, as to how a proponent of GPS evidence might meet its authentication obligations in another case, the opinion in *Lizarraga-Tirado* is simply not persuasive. In addition to the fact that the court's discussion of FRE 901(b)(9) is *dictum*, it also provides no helpful analysis; rather, it merely states broad propositions and cites to other authorities, which themselves are not binding on our analysis of OEC 901 in this case.

Second, defendant's OEC 901 objections—specifically, that the screenshot evidence did not show what it purported to show—did not appear to be directed to the accuracy of the GPS data or the related Google Maps images; rather, they appeared directed at the question of whether those things, if accurate, showed that Garcia (or at least her smartphone), was in the indicated locations at the specified times. For example, she argued that parts of the exhibits were just "piece[s] of paper with a map with lines drawn on [them] * * * [but not] evidence that [the] piece[s] of paper [were] *connected to Ms. Garcia's phone*." (Emphasis added.) Defendant further argued that, even if *that* connection could

---

[6] Notably, the court also suggested that the government could satisfy the requirement of authentication through judicial notice of Google Earth's reliability, a possibility that the state advances in this case but that defendant does not address. *See Lizarraga-Tirado*, 789 F3d at 1110; *see also* Legislative Commentary to OEC 901, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 901.02, 951 (6th ed 2013) (stating that OEC 901(2)(i) "does not, of course, foreclose taking judicial notice of the accuracy of [a] process or system"). Here, we need not consider that possibility.

be made, the state had not established that the evidence showed what, in defendant's view, it purported to show, "that Ms. Garcia was in [the Portland/Vancouver area]" as opposed to in Hermiston. Those arguments appear more of a challenge to the evidence's probative value than its authenticity. In any event, they would not have triggered any obligation that the state might otherwise have had to prove that the underlying process by which Google Maps collected GPS data and generated the smartphone's travel route had done so accurately—*i.e.*, that the locations that the screenshots depicted were, in fact, the product of accurate GPS input and analysis—as OEC 901(2)(i) contemplates.[7]

Third, unlike cases such as *Lizarraga-Tirado*, establishing the reliability of the screenshot evidence in this case was not largely dependent upon a showing that the Google Maps program on Garcia's smartphone was capable of producing accurate results. Rather, in this case, Garcia was able to testify as a percipient witness that she (and her phone) had been in the Portland/Vancouver area at the specified times, thereby providing foundational support for the GPS evidence in a way that the agents in *Lizarraga-Tirado* could not. *Compare Lizarraga-Tirado*, 789 F3d at 1108 (although agents testified to being familiar with area in which they arrested the defendant, location was remote and agents relied upon handheld GPS device to determine their location); *and State v. Brown*, 424 SC 479, 488, 818 SE2d 735, 740 (SC 2018) (probation officer's testimony that GPS ankle monitor data placing probationer at robbery scene was reliable because agency used GPS records "in court all the time" did not satisfy "process or system" authentication provision of state's evidence code; testimony provided "no assistance in assessing the accuracy of the GPS records"); *with United States v. Brooks*, 715 F3d 1069, 1078 (8th Cir 2013) (emphasizing physical and circumstantial evidence corroborating

---

[7] To the extent that defendant's argument on appeal is more directed to the quality of the GPS data itself, rather than its connection to the location of Garcia or her smartphone, that argument is materially different from the arguments she presented to the trial court and is therefore not preserved for appeal. *See, e.g.*, *State v. Gray*, 286 Or App 799, 806, 401 P3d 1241 (2017), *rev den*, 362 Or 482 (2018) ("[T]he presence of a common thread between an objection at trial and an argument on appeal does not satisfy the preservation requirement if the two arguments are qualitatively different." (Internal quotation marks omitted.)).

accuracy of GPS tracking device in concluding that foundation was sufficient).

For each of those reasons, we see no merit to defendant's argument that, under the circumstances of her case, the state was required to satisfy the requirements of OEC 901(2)(i) to authenticate the screenshot images depicting the output of the Google Maps application on Garcia's smartphone. Rather, in this case, it makes sense to heed the reminder in *Sassarini* that, even as to modern digital evidence, authentication under OEC 901 is to be approached flexibly. And, in our view, flexibility means that we must eschew the one-size-fits-all approach of requiring all evidence produced through a technical process or system to be authenticated under OEC 901(2)(i). Instead, at least in this instance, we view the more appropriate provision of the evidence code to be OEC 901(2)(a), which permits a proponent of evidence to establish its authenticity through "[t]estimony by a witness with knowledge that a matter is what it is claimed to be." We proceed to consider the state's foundation for the screenshot evidence under that standard.

To determine whether the state's foundational evidence, specifically, Garcia's testimony, sufficiently authenticated the screenshot evidence under OEC 901(2)(a), we, again turn to *Sassarini* for guidance. In *Sassarini*, we described OEC 901's foundation requirement as the "'well-accepted requirement that whenever a piece of evidence is offered there must be certain minimum assurances that the evidence is what it purports to be, what it is offered as being, and what its value depends on.'" 300 Or App at 123 (quoting Legislative Commentary to OEC 901, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 901.02, 947 (6th ed 2013) (brackets omitted)). Bearing in mind that the burden under OEC 901 is "not high" and that the state was required only to make a *prima facie* showing of authenticity to allow the evidence to go to the finder of fact, *Sassarini*, 300 Or App at 130, we conclude that the state established a sufficient foundation for its evidence here.

Through the testimony of Garcia recounted above, the state made the requisite *prima facie* showing, thereby providing all necessary assurances that the evidence was

what it claimed to be. In contending that Garcia's testimony was insufficient to authenticate the screenshot evidence pursuant to OEC 901(2)(a), defendant primarily argues that "Garcia did not have the requisite knowledge to testify about the processes or systems that produced the underlying GPS data." As we have explained, however, that argument fails. To the extent that defendant argues that Garcia could not establish the workings of Google Maps and the reliability of its results, that argument is not preserved. 304 Or App at 387 n 7. And, as to the argument that defendant did preserve, that the screenshot evidence did not reflect the smartphone's location at the indicated times, Garcia's lay testimony puts that argument to rest.[8] Garcia testified about her familiarity with the Google Maps application and described the steps that she had taken to create the screenshots on her smartphone and transfer them to the state. Garcia also testified that her phone and, for that matter, that she, herself, had traveled as the screenshots indicated on the dates they showed. For several of the dates, Garcia emphasized that she was testifying to those facts based on her independent recollection, rather than merely relying on the screenshot evidence itself. And, as to the one date for which she could not initially recall her whereabouts, she was able to recall based on the related screenshots that they, too, were accurate. Accordingly, Garcia's testimony provided the requisite assurances that the evidence was what the state claimed it to be: screenshots of the Google Maps application on Garcia's phone that showed the location of the phone on the dates in question.

As a result, Garcia's testimony was legally sufficient to make the required *prima facie* showing of authenticity under OEC 901(2)(a). Once the state made that showing, any evidence or argument going to whether the screenshots

---

[8] Because we conclude that the state was not required to authenticate the GPS evidence under OEC 901(2)(i), we express no opinion whether lay testimony would be sufficient for that purpose, or, instead, the state would have to satisfy the more stringent foundational requirements for scientific evidence. *See generally* Wright & Gold, 31 *Federal Practice and Procedure* § 7114 at 143 (discussing evidentiary issues arising under FRE 901(b)(9) and potential interplay with scientific evidentiary issues under FRE 702). *See also O'Key*, 321 Or at 292-93, 293 n 8 (discussing evidentiary foundations under OEC 702 and possible role of judicial notice); *State v. Branch*, 243 Or App 309, 311, 259 P3d 103, *rev den*, 351 Or 216 (2011) (admitting lidar evidence despite absence of expert testimony).

were sufficiently persuasive to establish, as fact, that Garcia had been in the Portland/Vancouver areas at the indicated times, were matters for the court to consider in its ultimate role as finder of fact, and not in its gatekeeper capacity under OEC 901. *See Sassarini*, 300 Or App at 127 ("'This requirement of showing authenticity *** falls in the category of relevance dependent upon fulfillment of a condition of fact and is governed by [OEC 104].'" (Quoting Legislative Commentary to OEC 901, *reprinted in* Kirkpatrick, *Oregon Evidence* § 901.02 at 946.)). The trial court, therefore, did not err.

Affirmed.